United States District Court
Southern District of Texas
**ENTERED**
September 23, 2022
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| EZEKIEL JOSHUA HALL, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No. H-20-2416 |
| | § | |
| L. INGLE, *et al.*, | § | |
| | § | |
| *Defendants.* | § | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, a pretrial detainee in custody of the Montgomery County Sheriff's Office, filed this *pro se* civil lawsuit under 42 U.S.C. § 1983 against Montgomery County deputies Curtis Jones, Michael Orso, and Lee Ingle. The defendants filed a motion for summary judgment (Docket Entry No. 34), to which plaintiff filed a response (Docket Entry No. 42) and the defendants filed a reply (Docket Entry No. 43).

Having considered the motion, the exhibits, the response, the reply, the record, and the applicable law, the Court **GRANTS** the motion for summary judgment and **DISMISSES** this lawsuit for the reasons shown below.

**I. BACKGROUND AND CLAIMS**

Plaintiff states that the defendants used excessive force during his arrest on May 14, 2019. According to the defendant, they pursued a vehicle being driven by plaintiff, bearing license plates associated with a United States Marshal Service arrest warrant. The call slip received by the defendants cautioned that the subject was "known to have threatened peace

officers. Armed and dangerous." Plaintiff crashed his vehicle during the lengthy pursuit then fled on foot; the defendants gave chase. No other individuals were observed in or exiting plaintiff's vehicle following the crash. Defendant Jones was injured during the foot chase and ceased chasing plaintiff. Defendants Ingle and Orso eventually caught plaintiff and attempted to place him under arrest. Plaintiff resisted the deputies' efforts to apply hand restraints, and defendant Orso discharged his taser. The deputies were able to handcuff plaintiff and he was treated by paramedics at the scene for minor abrasions. The vehicular pursuit and arrest were captured on defendant Ingle and Orso's dash and body cameras.

Plaintiff was charged with felony evading arrest/detention and unlawful possession of a firearm by a felon. He pleaded guilty to the charges. He claims in the instant lawsuit that the defendants used excessive force against him during the arrest. Plaintiff seeks monetary damages against the defendants in their individual capacity.

## II. SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate when, viewing the evidence in the light most favorable to the non-movant, the court determines "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Dyer v. Houston*, 964 F.3d 374, 379 (5th Cir. 2020). In making that determination, a court must view the evidence in the light most favorable to the nonmoving party. "The

movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine [dispute] of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007).

The court will generally "draw all inferences in the plaintiff's favor." *Dyer*, 964 F.3d at 380. However, if record evidence clearly contradicts the plaintiff's version of events, the court "should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Waddleton v. Rodriguez*, 750 F. App'x 248, 253–54 (5th Cir. 2018) (per curiam) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). If the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and present evidence to show "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In ruling on a motion for summary judgment the Court does not "weigh evidence, assess credibility, or determine the most reasonable inference to be drawn from the evidence." *Honore v. Douglas*, 833 F.2d 565, 567 (5th Cir. 1987). "Conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *U.S. ex rel. Farmer v. City of Houston*, 523 F.3d 333, 337 (5th Cir. 2008) (cleaned up).

## III.  ANALYSIS

A.  <u>Use of Excessive Force</u>

The Fourth Amendment guarantees the right to be free from excessive force during an arrest. To succeed on the merits of a Fourth Amendment claim, a plaintiff must show (1) an injury that (2) "resulted directly and only from a use of force that was clearly excessive to the need," the excessiveness of which was (3) objectively unreasonable. *Griggs v. Brewer*, 841 F.3d 308, 312 (5th Cir. 2016); *see also Craig v. Martin*, ___F.4th___, 2022 WL 4103353, at *2 (5th Cir. Sept. 8, 2022). Because some use of force by law enforcement is reasonable when necessary to effect an arrest, a court must decide whether the force used was clearly excessive to the need. *See Scott v. Harris*, 550 U.S. 372, 382–83 (2007).

The Court's Fourth Amendment inquiry is fact intensive and focuses on whether the officers' actions were objectively reasonable, considering the particular circumstances at the time force was used. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Conner*, 490 U.S. 386, 396 (1989). Factors to consider include the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Id.* "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary

in a particular situation." *Id.*, at 396–97. The officer's motive or intention is irrelevant to the inquiry. *Id.*, at 397.

Here, plaintiff claims that the defendants used excessive force during his arrest by hitting, kicking, and tasing him even though he was handcuffed and cooperating with the deputies. He claims that he sustained one or more broken ribs and a fractured wrist as a result of the defendants' unlawful actions. The defendants, on the other hand, argue that their actions were necessary in order to overcome plaintiff's flight and to handcuff him. They state that no force was used against plaintiff once he was handcuffed and under control, and that the medical records refute plaintiff's claim of sustaining a fractured wrist or ribs.

The Harris County Incident/Investigative Report submitted by the defendants in support of their motion for summary judgment summarizes the incident of May 14, 2019, as follows:

> The vehicle pursuit began in the 21600 block of State Highway 249, lasted approximately 23 minutes, and ended in the 10600 Old Bammel North Houston Road. Throughout the vehicle pursuit, the driver drove in an extremely reckless manner reaching speeds of approximately 100 mph, ran several red lights, and showed no regard for any other motorist['s] safety.
>
> * * * *
>
> Offender sustained multiple abrasions to his face, elbows, and taser darts to right side of his back. In addition, the Offender appeared to be under the influence of PCP due to the strong distinct odor emitting from his persons [*sic*]. Deputy C. Jones sustained injuries to his right leg/foot during foot pursuit. Harris County Medical Corps arrived on scene . . . and transported Offender to Houston Northwest Hospital.

(Docket Entry No. 34-1, p. 5.)

In his Officer Narrative portion of the report, defendant Ingle stated that he, along with defendants Jones and Orso, had attempted to initiate a traffic stop on a wanted suspect associated with the license plate of a car being operated by plaintiff. The "wanted hit return" on the vehicle advised that the suspect was a "Threat Against Peace Officers." *Id.*, p. 5. Defendant Ingle noted that plaintiff "was wanted for making deadly threats against Law Enforcement and was known to carry a firearm at the time of his stop." *Id.* However, plaintiff refused to stop and fled from the deputies.

Defendant Ingle stated that they pursued plaintiff's vehicle, which was proceeding in an extremely dangerous and reckless manner. The pursuit ended when plaintiff lost control of his vehicle and crashed. Plaintiff then exited his vehicle fled on foot. Defendant Ingle noted that plaintiff was being sought for making deadly threats against law enforcement officers and was known to carry a firearm. He described their capture and arrest of plaintiff as follows:

> At that time, I, along with [the] other Deputies, gave chase on foot after [plaintiff] using extreme caution. I caught up to [plaintiff] a short time later and utilized an open hand strike to his backside causing him to fall forward to the ground in order to maintain safety and control in case [he] had a weapon. [Plaintiff] fell to the ground and I immediately placed my knee on [his] upper body to gain leverage over him in attempt [to] keep him from getting up. [Plaintiff] refused to obey verbal commands to place his hands behind his back, therefore I began striking [him] in his right side with a closed fist continuously giving him verbal commands to place his hands behind his back. Deputy Orso deployed his taser into the right side of [plaintiff's] back. [Plaintiff] continued to actively resist us where we had to force both arms behind his back and into handcuffs.

6

> Note: Photographs of [plaintiff's] injuries were taken utilizing a digital camera and later uploaded into the Authenticated Digital Assessment Management System (ADAMS).
>
> [Plaintiff] was then escorted and placed in the back seat of Deputy Orso's patrol vehicle until arrival of emergency medical services. During the inventory of [plaintiff's] vehicle, [a deputy] recovered a loaded Glock 22 . . . from the driver's floor board[.] A criminal history was [*sic*] conducted on [plaintiff] revealed he had several felony convictions.

*Id.*, pp. 5–6. A K-9 team had been placed on notice of the on-going foot chase, but Harris County Sheriff's Office Sergeant Boehm stated in his report that, "As I rounded the east side of the business, I observed the suspect had already been tased and was on the ground. I remained close until the suspect was secured in handcuffs." *Id.*, p. 16.

Defendant Jones submitted an affidavit in support of the motion for summary judgment, wherein he testified that he sustained a serious and disabling ankle injury that caused him to stop running and ultimately required surgery. (Docket Entry No. 34-3, p. 3.) He testified that, due to his injury, he did not participate in or witness plaintiff's capture. *Id.* He further testified that an arrest warrant from the U.S. Marshals Service was associated with the vehicle being driven by plaintiff, and that the subject had threatened peace officers and was "caution armed and dangerous." *Id.* Defendant Jones stated that a handgun, ammunition, counterfeit currency, and various narcotics were recovered from plaintiff's vehicle following his arrest. *Id.*

Defendant Orso also submitted an affidavit in support of the motion for summary judgment. (Docket Entry No. 34-5.) In his affidavit, defendant Orso testified that he

observed a call slip which advised that an arrest warrant from the U.S. Marshals Service was associated with the vehicle being driven by plaintiff, and to take "caution subject known to have threatened peace officers. Armed and dangerous." *Id.*, p. 3. Defendant Orso described the foot pursuit and arrest of plaintiff as follows:

> When I caught up with [plaintiff], he was on the ground and refusing my command and the commands of other deputies to place his hands behind his back. We specifically ordered [him] to put his hands behind his back because of the risk that he may draw a gun from his slacks. [Plaintiff] refused to comply and had access to the pockets in his slacks. Ingle delivered several close fist strikes to [plaintiff's] back in an effort to gain compliance. [Plaintiff] continued to refuse to release his arms. I deployed my taser, fired the darts on [plaintiff's] back and cycled the taser once. When I bent down to assist Ingle, [plaintiff] grabbed my hand. Because I had been bitten by another suspect in a very similar position, I placed my right knee along the back of [plaintiff's] head to limit movement and prevent him from biting me. [Plaintiff] released his arms. He was handcuffed and escorted to my patrol car.
>
> [Plaintiff] appeared to be intoxicated and did not complain of any injuries. He did not lose consciousness. No one punched him in the face or kicked him.
>
> \* \* \* \*
>
> A Harris County ambulance arrived to treat minor abrasions [plaintiff] sustained and a foot injury Jones sustained during the foot chase. A handgun, ammunition, counterfeit currency, and various narcotics were recovered from [plaintiff's] vehicle.

(Docket Entry No. 34-5, pp. 3–4.)

In his own affidavit in support of the motion for summary judgment, defendant Ingle testified in relevant part as follows:

> On May 14, 2019, I was on duty as a uniformed deputy. I was equipped with a body worn camera. I was operating a marked Harris County Sheriff's patrol vehicle with Jones, my Field Training Officer, as my passenger, and

participated in the pursuit of a red 2011 Chevrolet Cobalt bearing Texas license plate [ ]. Our vehicle took over as the primary unit in this pursuit. During the pursuit I read a call slip associated with that license plate which disclosed an arrest warrant from the United States Marshals Service and stated "caution subject known to have threatened peace officers. Armed and dangerous." The operator of the vehicle who was later identified as [plaintiff], refused to pull over and led me and other deputies on a pursuit lasting twenty-three minutes in which [plaintiff] sped through red lights and exceeded the speed of 100 miles per hour. Finally, he crashed his vehicle at a curb. . . . [Plaintiff] got out of the Chevrolet and fled on foot. He was shirtless. There were no other occupants in the vehicle.

[Plaintiff] refused my orders to stop running and give up. I chased him on foot. When I caught up with [him], I delivered an open hand strike on his back to displace his balance, and he fell forward on the ground. I was concerned he might have a weapon in his slacks which were sagging and ordered him to stop resisting and place his hands behind his back. While on the ground [plaintiff] refused my commands and the commands of Orso to stop resisting and place his hands behind his back. I was concerned that he might be carrying a gun in his slacks based upon the call slip information. I delivered several closed fist strikes to [plaintiff's] back/side as a pain compliance technique taught by our training academy in an effort to gain his compliance in placing his hands behind his back. [He] continued to refuse. Orso deployed his taser, fired the darts at [plaintiff's] back and cycled it once. [Plaintiff] released his arms and was then placed in handcuffs and escorted to Orso's patrol car. I immediately ceased all force once [plaintiff] was successfully handcuffed.

[Plaintiff] appeared to be intoxicated and did not complain of any injuries. He did not lose consciousness. No one punched him in the face or kneed him.

\* \* \* \*

A Harris County ambulance arrived to treat minor abrasions [plaintiff] sustained to his face, elbows, and back. Jones sustained an injury to his foot and ankle during the foot pursuit. A handgun, ammunition, counterfeit currency, and various narcotics were recovered from [plaintiff's] vehicle.

(Docket Entry No. 34-6, pp. 3–4.)

9

The defendants submitted as additional summary judgment evidence two dash camera and two body-worn camera videos taken by the defendants during the actual incident, as well as full-color photographs of plaintiff's injuries taken at the time of his arrest. (Docket Entry No. 34, Exhibit C.) The photographs support plaintiff's allegations that he sustained injuries to his nose, elbows, shoulders, and back; however, the photographs show that these injuries were superficial scratches and abrasions. The photographs also show that plaintiff had two taser darts imbedded in the right side of his lower back, consistent with the defendants' assertion that a taser was discharged once. The photographs do not, and cannot, support or refute plaintiff's claim that he sustained one or more rib fractures and a wrist fracture. However, plaintiff's medical records from his post-arrest examinations and treatment at the Harris County Jail show that x-rays revealed no rib fractures, and that he did not report any concerns with his wrist. (Docket Entry No. 34-11, pp. 12–13, 19.) He reported a history of having a prior forearm fracture requiring surgery. Plaintiff was provided pain relief medication and topical ointments for the abrasions. His mental health and other pre-existing medical conditions were also addressed and treated.

Of primary significance are the two body-worn camera videos taken by the defendants Ingle and Orso during their pursuit of plaintiff on foot and the events surrounding his apprehension and arrest. Normally, a plaintiff's factual allegations are taken as true to determine whether they are legally sufficient to defeat a motion for summary judgment. *Craig v. Martin*, ___ F.4th ___, 2022 WL 4103353, at *2 (5th Cir. Sept. 8, 2022).

However, if there is video evidence that "blatantly contradicts" the plaintiff's allegations, "the court should not adopt the plaintiff['s] version of the facts; instead, the court should view those facts 'in the light depicted by the videotape.'" *Id. See also Scott*, 550 U.S. at 381 (explaining that a court deciding a motion for summary judgment based on qualified immunity need not rely on the plaintiff's description of the facts where the record discredits that description, but should instead consider "the facts in the light depicted by the videotape").

The Court has carefully reviewed the two body-worn camera videos. Defendant Orso's body-worn camera video shows the following time-stamped chronology of events:

| | |
|---|---|
| 2:04:24 | Orso runs to the scene behind a building, where plaintiff is on the pavement curled up on his left side. Two deputies are present, one with his knee on or near the right side of plaintiff's back, the other at plaintiff's feet moving plaintiff's leg away from his body. |
| 2:04:25–26 | Plaintiff is repeatedly ordered to roll over, but he remains on his side. The deputy at his feet straightens plaintiff's body out by moving his legs away from his body. The deputy at plaintiff's head strikes plaintiff twice on his right side or back while ordering him to roll over. Plaintiff does not roll over. |
| 2:04:27 | The deputy continues moving plaintiff's legs away from his body; plaintiff remains on his side with his legs straight out. |
| 2:04:28–30 | Plaintiff rolls over to his back but not to his stomach. Plaintiff is ordered to place his hands behind his back, but he keeps his arms crossed over the front of his chest. |
| 2:04:30–32 | The deputies physically log-roll plaintiff over to his stomach. He keeps his arms underneath him and does not put them behind his back. |

11

| | |
|---|---|
| 2:04:33 | Plaintiff is on his stomach, resting on his elbows with his legs out straight. The deputy at plaintiff's head appears to have a knee on plaintiff's back near his head, with a hand on the middle of plaintiff's back. The second deputy is standing away from plaintiff pointing a weapon in his direction. A K-9 team can be seen in the background. |
| 2:04:34 | The deputy at plaintiff's head physically picks up and moves plaintiff's arm from plaintiff's front to his side then to his back. |
| 2:04:35–36 | A deputy discharges a taser at plaintiff and states that he "got one in." Plaintiff is not in handcuffs. |
| 2:04:37 | The deputy at plaintiff's head picks up and moves plaintiff's arms into position behind his back and begins to apply handcuffs. Plaintiff is ordered to give the deputy his arm, but he refuses and the deputy physically moves the arm into position. Plaintiff is handcuffed. |
| 2:05:06 | The deputies finish handcuffing plaintiff and move away from him. Plaintiff remains on the pavement on his stomach. |
| 2:05:10 | The deputies search plaintiff and his clothing while he remains on the ground. A deputy warns plaintiff not to grab the deputy's hand again, to which plaintiff responds, "Yes sir." |
| 2:06:01 | The deputy completes his search of plaintiff's clothing and helps plaintiff to a sitting position. |
| 2:06:08–59 | The deputies help plaintiff to a standing position and walk with him towards the patrol cars. Plaintiff walks on his own with no apparent difficulty, saying that he "doesn't understand what's going on" and that he "didn't do anything wrong." |
| 2:07:00–30 | Plaintiff stands against the patrol car while a deputy removes his shoes. Plaintiff continues asking, "what's going on?" |
| 2:07:35 | Plaintiff is placed in the back of a patrol car without incident. |

(Docket Entry No. 34, Exhibit C.)

Defendant Ingle's body-worn camera video shows the following time-stamped chronology of events:

| | |
|---|---|
| 2:04:07 | Ingle arrives at the scene of plaintiff's car crash, plaintiff is seen exiting his car and running away from the deputies. Ingle orders plaintiff to show his hands, but plaintiff continues fleeing. Ingle gives chase as plaintiff runs behind a building. |
| 2:04:19 | Ingle catches up to plaintiff and plaintiff is seen falling to the pavement. |
| 2:04:20–28 | Plaintiff is on the pavement on his side, curled inwards. Ingle repeatedly orders him to put his hands behind his back, but plaintiff does not comply. A second deputy is standing by plaintiff's legs and a third deputy is aiming a taser at plaintiff. |
| 2:04:28–34 | A taser a discharged in plaintiff's direction. Ingle repeatedly orders plaintiff to roll over, but plaintiff does not comply. The deputies attempt to roll plaintiff over and to access his hands. Plaintiff does not comply with orders to put his hands behind his back. |
| 2:04:35–39 | Ingle takes hold of plaintiff's arm and places it behind his back. |
| 2:04:40–57 | Plaintiff is rolled over to his stomach. Ingle continues ordering plaintiff to give him his hands for handcuffing, but he does not comply and the deputies take plaintiff's hands and place them behind his back. They begin handcuffing plaintiff. A deputy has a knee on plaintiff's lower back or buttocks holding plaintiff in place. |
| 2:05:02–06 | Ingle finishes handcuffing plaintiff and moves away from him. Plaintiff remains on his stomach on the pavement with his hands cuffed behind his back. |
| 2:05:23–51 | Deputies are seen searching and inspecting plaintiff and his clothing. |

2:06:04–34    Deputies help plaintiff to a sitting then to a standing position, and begin walking with him toward the patrol cars. Plaintiff repeatedly says "What the f-ck is going on" and "I don't understand what's going on." He says he has PTSD and has been "tased 25 times" and "didn't do anything." He is accompanied by the deputies, and is walking and talking with no apparent difficulty.

2:07:10–27    They arrive at the patrol car and plaintiff is placed up against the vehicle. A deputy unties and removes plaintiff's shoes without incident.

2:07:35    Plaintiff is placed in the back of the patrol car without incident.

2:08:30    The deputies search plaintiff's car and find a loaded Glock firearm under the driver front seat.

*Id.*

Contrary to plaintiff's arguments, the body-worn camera videos do not show that defendants Ingle, Orso, or Jones repeatedly kicked, punched, or "beat" him, either before or after he was handcuffed. The videos show that defendant Ingle struck or pushed plaintiff once when he caught up to plaintiff, thus stopping plaintiff's flight from the deputies. The videos further show that plaintiff did not comply with the deputies' numerous orders to roll over and put his hands behind his back. Although it does not appear that plaintiff physically fought the deputies, he clearly did not comply with their orders. Defendant Ingle administered two strikes to plaintiff's back or side when plaintiff failed to roll over and put his hands behind him. Defendant Ingle acknowledges that the strikes were to get plaintiff to put his hands behind his back for handcuffs:

14

> [Plaintiff] fell to the ground and I immediately placed my knee on [his] upper body to gain leverage over him in attempt [to] keep him from getting up. [Plaintiff] refused to obey verbal commands to place his hands behind his back, therefore I began striking [him] in his right side with a closed fist continuously giving him verbal commands to place his hands behind his back.

(Docket Entry No. 34-1, pp. 5–6.) Further, the videos show that plaintiff was tased before he was handcuffed, during his refusals to comply with the deputies' orders, and not after. In all, the body-worn camera videos show that any force used by the deputies was used to stop plaintiff's attempted escape, gain control over him, and place him in handcuffs.

The factors for the Court to consider under *Graham* hold against plaintiff in this case. The defendants were on notice that plaintiff had threatened law enforcement officers and was considered "armed and dangerous." Moreover, he twice fled from the deputies – by vehicle, then on foot. Because plaintiff was reported as "armed and dangerous," was attempting to escape in a public place, and was believed to be in possession of a firearm, he posed an immediate threat to the safety of the deputies and others. He refused to comply with the deputies' orders to roll over and present his hands, and it became necessary for them to physically roll him over, take control of his hands, and handcuff him. A certain degree of physical force was required to complete plaintiff's arrest due to his attempted escape and lack of compliance, and the videos do not evince any use of excessive force by the defendants.

In his response to the motion for summary judgment, plaintiff baldly contends that the videos were "altered." (Docket Entry No. 42, p. 1.) He provides no support or probative summary judgment evidence for this assertion, and his bare allegation is insufficient to raise

a genuine issue of material fact precluding summary judgment. Plaintiff further argues that the body-worn camera videos support his claim that he was punched and kicked while "no threat" to the defendants, directing the Court to defendant Orso's body-worn camera video at 2:04:26 and 2:04:38. However, the video shows that plaintiff refused to follow the deputies' orders, and that once plaintiff was rolled over and handcuffed, no further force was used. In the videos, no one kicks plaintiff or punches him in the face.

The body-worn camera videos provide no support for plaintiff's claims for use of excessive force; indeed, the videos refute plaintiff's narrative of the events. As noted earlier, the videos show that plaintiff fled from the defendants on foot and was brought down by a single strike or push. Plaintiff was curled up on his side, and the deputies ordered him to roll over for handcuffs. When plaintiff did not comply, the deputies straightened plaintiff's body and attempted to log-roll him to his stomach. Defendant Ingle administered two strikes to plaintiff's back to get him to roll over to his stomach and put his hands behind him. Plaintiff instead rolled over to his back and kept his arms crossed over his chest. The deputies grabbed his arms and physically rolled plaintiff over, putting his arms behind his back for handcuffs. *Id.* at 2:04:32. Contrary to plaintiff's allegations, the videos clearly show that he did not cooperate with the deputies or follow their commands.

The force used by the defendants was reasonable and necessary under the circumstances, and no use of excessive force is shown.

Plaintiff raises no genuine issues of material fact sufficient to defeat the defendants' motion for summary judgment, and the motion is **GRANTED** as to plaintiff's claims for use of excessive force. Plaintiff's claims against defendants Ingle, Orso, and Jones are **DISMISSED WITH PREJUDICE**.

B.   Qualified Immunity

The defendants claim entitlement to qualified immunity as to plaintiff's claims for use of excessive force. Plaintiff bears the burden to negate the defense of qualified immunity. *See Hanks v. Rogers*, 853 F.3d 738, 744 (5th Cir. 2017).

Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law. *Pratt v. Harris County*, 822 F.3d 174, 181 (5th Cir. 2016). Whether force is excessive and unreasonable depends on the totality of the circumstances. *Aguirre v. City of San Antonio*, 995 F.3d 395, 407 (5th Cir. 2021). The reasonableness inquiry is objective and based on what the officers knew at the time. *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012). "If officers of reasonable competence could disagree as to whether the plaintiff's rights were violated, the officer's qualified immunity remains intact." *Hanks*, 853 F.3d at 744 (cleaned up). Thus, "qualified immunity represents the norm, and courts should deny a defendant immunity only in rare circumstances." *Angulo v. Brown*, 978 F.3d 942, 949 (5th Cir. 2020).

As noted earlier by the Court, the factors for evaluating an excessive force claim as set forth in *Graham* disfavor plaintiff in this instance. *Graham*, 490 U.S. at 396. Plaintiff

was fleeing from the deputies in a public area, was considered armed and dangerous, and had threatened law enforcement officers in an earlier incident. Moreover, "[t]he intent or motivation of the officer is irrelevant; the question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." *Roque v. Harvel,* 993 F.3d 325, 333 (5th Cir. 2021) (internal citations omitted). "Some amount of deference is afforded to the officer's discretion, as his or her service in real time, in unknown environs, often requires split-second decisions based on evolving information." *Brown v. Glossip,* 878 F.2d 871, 873 (5th Cir. 1989).

To negate the defense of qualified immunity, a plaintiff must establish that (1) an officer's conduct violated a constitutional right, and that (2) the conduct was objectively unreasonable in light of clearly established law at the time of the alleged violation. A reviewing court may address the two prongs of the qualified immunity analysis in any sequence, depending on the circumstances of the particular case at hand. *Pearson v. Callahan,* 555 U.S. 223, 236 (2009); *Heaney v. Roberts,* 846 F.3d 795, 801 (5th Cir. 2017). The Court determined above that the defendants are entitled to summary judgment dismissal of plaintiff's claims for use of excessive force. Consequently, plaintiff has not met his burden of proof as to the first prong, and consideration of the second prong is unnecessary. The defendants are entitled to qualified immunity as to plaintiff's claims for use of excessive force.

Plaintiff's claims for use of excessive force against the defendants in their individual capacity are **DISMISSED WITH PREJUDICE** as barred by qualified immunity.

## IV.  CONCLUSION

For the above reasons, the defendants' motion for summary judgment (Docket Entry No. 34) is **GRANTED** and this lawsuit is **DISMISSED WITH PREJUDICE**.  Any and all pending motions are **DENIED AS MOOT**.

Signed at Houston, Texas, on this the 22nd day of September, 2022.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE